

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION**

FILED

APR 1 1 2007

U.S. DISTRICT COURT
BAY CITY, MICHIGAN

UNITED STATES OF AMERICA,

    Plaintiff,

CASE NUMBER: 93-CR-20050-03
94-CR-20061-01

v.

DISTRICT JUDGE ROBERT CLELAND
MAGISTRATE JUDGE CHARLES BINDER

JOSE GALAVIZ,

    Defendant.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AFTER EVIDENTIARY HEARING

**I. RECOMMENDATION**

For the reasons set forth below, IT IS RECOMMENDED that Defendant be found GUILTY of violating the following conditions of his supervised release: Standard Condition No. 2, Special Condition No. 5, and the mandatory condition that he not commit another federal, state or local crime.

**II. REPORT**

    **A. Introduction**

Pursuant to orders of reference from United States District Judge Robert Cleland (Case No. 93-CR-20050, Dkt. 371; Case No. 94-CR-20061, Dkt. 20),[1] an evidentiary hearing was held on March 1, 2007, on petitions alleging that Defendant violated several conditions of his supervised release. (Dkts. 365 & 372; Dkts. 14 & 21.)

---

[1] Hereafter, parallel citations to the record shall follow this format, with the first citation referring to Case No. 93-CR-20050-03 and the second citation referring to Case No. 94-CR-20061-01.

The first petitions (Dkt. 365; Dkt. 14) alleged that Defendant violated Standard Condition No. 2 of his supervision by failing to report to his probation officer during April and May 2006 and violated Special Condition No. 5 when a urinalysis specimen taken in early February 2006 was positive for marijuana. The second petitions (Dkt. 372; Dkt. 21) realleged these violations and added a third allegation that Defendant violated the mandatory condition that he not commit any other federal, state or local crime, stating that on or about December 27, 2006, he possessed a firearm.

### B. Evidentiary Hearing Testimony

John Wright, Defendant's Supervising Probation Officer, was called as the Government's first witness. He described the circumstances underlying the allegations relating to conditions 2 and 5. As to the violation of condition 2, Probation Officer Wright testified that he allowed Defendant to travel to Arizona, but that Defendant failed to contact Officer Wright after his return. Officer Wright testified that he then lost contact with Defendant, although members of Defendant's family promised to have Defendant contact him. Officer Wright's next contact with Defendant came after Defendant was arrested in December 2006 on new charges. With regard to the violation of condition 5, Officer Wright testified that preliminary testing of a urine specimen taken on February 17, 2006, indicated positive for marijuana. Subsequent laboratory analysis confirmed that result. Defense counsel did not cross-examine Officer Wright.

With regard to the alleged violation of the mandatory condition, the first Government witness was Saginaw County Deputy Sheriff Kurt Webber. He testified that he had been with the Saginaw County, Michigan, Sheriff's Department for more than 9 years and had spent the previous 3 to 4 years on patrol duty. While on routine patrol on December 27, 2006, at approximately 3:00 a.m., he monitored radio traffic indicating that an armed robbery had taken place at a gas station

on Dixie Highway in Bridgeport, Michigan, a township located in the eastern central portion of Saginaw County. Deputy Webber stated that from the context and the voice making the radio calls, he knew they were coming from a Michigan State Trooper who was at the scene of the robbery, and not from Central Dispatch. Initially, the suspect vehicle was identified as being red in color. However, the red vehicle was discovered to be an employee's vehicle and shortly thereafter another radio call described the suspect vehicle as a white vehicle with two occupants driving north on Dixie Highway.

Shortly after these radio calls, Deputy Webber was proceeding east on Webber Street when he saw a white vehicle proceeding westbound on Webber Street near the intersection of Webber and Dixie Highway, which at that location is also known as East Genesee Avenue. He testified that he could not tell how many occupants were in the vehicle due to darkness. Although the exact location of the armed robbery was never stated, the Deputy estimated that Bridgeport was approximately 1 to 2 miles from the intersection where he first saw the white vehicle.[2]

After viewing the white vehicle, Deputy Webber turned his patrol vehicle around and began to follow the white vehicle at a distance of six to seven car lengths. As he turned around, however, the vehicle sped away. Deputy Webber testified that he elected not to activate his lights or siren, but continued to follow the vehicle. The white vehicle proceeded west on Webber Street, turned left on Ray Street, proceeded south on Ray Street for one block, and then turned right onto Carter Street. The white vehicle then pulled into the driveway of what appeared to be a single family residence that Deputy Webber believed was 3329 Carter Street.[3] At this point, Deputy Webber activated his overhead lights and parked his patrol vehicle across the end of the driveway. He

---

[2] See, Attachment 1 to this document which is a map of the general area.

[3] See, Attachment 2 to this document which is an enlarged map showing the Carter Street area.

3

exited his patrol vehicle and saw the lone occupant of the white vehicle approach the front door of the house. Deputy Webber ordered the individual to stop. The individual refused, stating that he had done nothing wrong. As the individual approached the front door of the residence, Deputy Webber ordered him to lie on the ground. The individual refused, repeating that he had nothing wrong, and continued toward the door. During or shortly after this exchange, the deputy drew his taser weapon.

Deputy Webber testified that he approached the individual as he was knocking on the front door of the residence and yelling to the occupants to let him in. Deputy Webber stated that as the individual gained entrance to the house, either by pushing in the door or by being admitted by the occupants, he fired his taser weapon. He believes he struck the individual, as he heard a scream as the individual either fell into or was let into the house. Deputy Webber estimated that he fired the taser at approximately a one- to two-foot range.

Deputy Webber next issued a radio call for assistance. Three officers and a sergeant from different departments arrived and established a loose perimeter around the Carter Street residence. Deputy Webber returned to the front door and was allowed entrance into the living room, where he encountered a black male and female. Deputy Webber asked where the person was who gained entrance, and the occupants told him that he went out the back door. Other officers also entered the house and, after a brief search, Deputy Webber heard the sergeant announce that the person had been found in the basement. Deputy Webber testified that the person was handcuffed and taken to Deputy Webber's patrol vehicle. Once he was secured, Deputy Webber heard from one of the other officers that the officer had looked through the windshield of the car driven by the person they arrested and had seen a handgun in the front seat area. Deputy Webber also saw the handgun and the sergeant took photographs. The officers ran the registration of the vehicle, which was a

4

1992 Lincoln Towncar, and learned that it was registered in the name of Defendant Jose Galaviz. The vehicle was locked, a wrecker service was called, and the weapon was retrieved.

Saginaw County Deputy Sheriff Sergeant Mark Przybylski testified next. He stated that he also heard the radio calls relating the armed robbery in Bridgeport and was watching for a white vehicle. Shortly after 3:00 a.m. he received Deputy Webber's call for assistance on Carter Street. When he arrived, he saw the deputy's patrol car parked behind a white vehicle that was in the driveway. After learning of the situation, he and other officers established a loose perimeter around the home and began searching for the suspect. The sergeant testified that he spoke with the owner of the home, Mr. Owens, who said that he heard a pounding on the door, unlocked the door and someone whom he did not at first recognize pushed his way into the house.

Sergeant Przybylski testified that he found the suspect at the bottom of the basement stairs and apprehended him. The suspect repeatedly stated that he hadn't done anything wrong. Sergeant testified that once the suspect, who was later identified as Defendant Galaviz, was secured in Deputy Webber's vehicle, he was notified that a handgun was seen in the front seat area of the white vehicle in the driveway. Once the vehicle was opened by a wrecker service, Sergeant Przybylski took photographs of the handgun, which they determined to be of .357 caliber and loaded.

Ronald Owens was called by to testify by the defense. He stated that on December 27, 2006, between 2:30 and 3:00 a.m., he was with his wife on the couch in his living room of the Carter Street residence when he heard loud knocking on the front door. He testified that at first he did not see anyone but then he heard the nickname "Boz," which he recognized, and opened the door. The person at the door took off through the house towards the kitchen. He next saw the

5

person in a police car outside his residence. His remaining testimony was generally consistent with that of the officers.

During cross-examination by the Assistant U.S. Attorney, Mr. Owens acknowledged that Defendant had lived nearby a "good while," which he estimated to be one to two years. He testified that he had last seen Defendant two or three days prior to the December 27th incident at a store, where they made small talk. Mr. Owens testified that he had last visited with Defendant at his home about three weeks earlier. At that time, he helped Defendant move furniture.

### C.   Motion Standards

The Supreme Court has recognized that a defendant charged with violating a release condition, unlike a defendant charged with violating a statute, does not enjoy the full panoply of rights normally available in a criminal proceeding. *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). Defendants in revocation proceedings face a lower standard of proof. *United States v. Loy*, 237 F.3d 251, 260 (3d Cir. 2001) (recognizing the preponderance of the evidence burden of proof in revocation of supervised parole proceedings). This standard was affirmed by the Supreme Court in *Johnson v. United States*, 529 U.S. 694, 700, 120 S. Ct. 1795, 146 L. Ed. 2d 727 (2000) (finding that although supervised release violations often lead to reimprisonment, the violative conduct need not be criminal and need only be found by a judge under a preponderance of the evidence standard, not by a jury beyond a reasonable doubt).

### D.   Discussion

#### 1.   Violation of Standard Condition No. 2

Standard Condition No. 2 provides that:

The Defendant shall report to the probation officer as directed by the Court or probation officer and shall submit a truthful and complete written report within the first five days of each month.

6

(Dkt. 372 at 1; Dkt. 21 at 1.) Probation Officer John Wright alleged that Defendant failed to report during the months of April and May 2006 (*id.*) and testified to that effect. Defendant presented neither argument nor evidence refuting this allegation. Therefore, I suggest that the Court find Defendant guilty of violating this condition of his supervised release.

### 2. Violation of Special Condition No. 5

Special Condition No. 5 provides that:

> The Defendant shall not possess or use alcohol or illegal drugs, be in the presence of anyone using, visibly affected by them, or possessing them, or frequent places where alcohol is served for consumption, with the exception of restaurants.

(Dkt. 372 at 2; Dkt. 21 at 2.) Probation Officer John Wright alleged that a urine specimen from Defendant on February 17, 2006, tested positive for marijuana (*id.*) and also testified to that effect. Defendant presented neither argument nor evidence refuting this allegation. Therefore, I suggest that the Court find Defendant guilty of violating this condition of his supervised release.

### 3. Violation of Mandatory Condition

The mandatory condition of release Defendant is charged with violating provides that he "shall not commit another federal, state, or local crime." (Dkt. 372 at 2; Dkt. 21 at 2.) Probation Officer John Wright alleged in the petitions to revoke supervised release that on or about December 27, 2006, Jose Galaviz did possess a firearm in violation of federal law. (*Id.*)

At the hearing, counsel for Defendant argued that the evidence of the weapon found in Defendant's vehicle should not be used against him because that evidence was obtained in violation of the Fourth Amendment. Defense counsel did not contest the testimony indicating that the weapon was in plain view in Defendant's automobile, but rather argued that because Defendant was first seen by Deputy Webber on an east-west street, when the direct route to the scene of the robbery was some distance south, Deputy Webber could not have possessed reasonable suspicion

7

that Defendant was the perpetrator. Thus, counsel argued that the deputy had no basis to begin following Defendant and all of his subsequent actions must therefore be considered the fruit of the poisonous tree and cannot be used against him pursuant to the Fourth Amendment's exclusionary rule.

The Assistant U.S. Attorney disputed these characterizations, stating that Deputy Webber's sighting of a car generally matching that described in the radio calls from the scene of the robbery in the early morning hours and within minutes of the robbery fully justified his further investigative actions. The Government argued that further support for Deputy Webber's actions could be found in Defendant's refusal to comply with the deputy's instructions, as well as his attempted escape into the Carter Street house. In other words, if reasonable suspicion supported Deputy Webber's initial decision to turn around and follow the white vehicle to the residential driveway, none his subsequent actions violated Defendant's Fourth Amendment rights.

I first note that courts have held that the exclusionary rule is inapplicable to supervised release revocation hearings, at least absent police harassment, which has not been alleged in the instant case. *See United States v. Blackshear*, 1993 WL 288297, *5 (6th Cir. July 29, 1993) (unpublished) (citing *United States v. Farmer*, 512 F.2d 160 (6th Cir. 1975)); *Banks v. United States*, 614 F.2d 95, 99 (6th Cir. 1980); *United States v. Hebert*, 201 F.3d 1103, 1104 (9th Cir. 2000) (the "exclusionary rule does not apply to supervised release revocation hearings"); *United States v. Montez*, 952 F.2d 854, 858 (5th Cir. 1992). Nevertheless, I suggest that even if the exclusionary rule applied, Defendant's Fourth Amendment rights were not violated by the officers' actions in this case.

8

In this Circuit, an ordinary traffic stop is like an investigative detention, the scope of which is governed by the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The Sixth Circuit has instructed that,

> [u]nder *Terry*, an officer is permitted to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. Likewise, a moving vehicle may be stopped to investigate an officer's reasonable and articulable suspicion that its occupants had engaged, were engaging, or were about to engage in criminal activity. Courts must determine from the totality of the circumstances whether law enforcement had an objective and particularized basis for suspecting criminal wrongdoing.

*United States v. Perez*, 440 F.3d 363, 370-71 (6th Cir. 2006) (citations and quotations omitted). In weighing what constitutes reasonable suspicion supported by articulable facts, courts are to keep in mind that,

> [w]hile reasonable suspicion must be based on more than ill-defined hunches, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. In considering the totality of the circumstances, we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.

*Id.* at 371 (citations and quotations omitted). *Accord United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) ("Even if each specific fact relied upon by the authorities to make a *Terry* stop would not be a basis for suspicion when considered in isolation, the reasonable suspicion necessary to support an investigatory stop can still be found when it is 'based upon an assessment of all circumstances surrounding the actions of a suspected wrongdoer.'").

The factors to be considered in this case begin with Deputy Webber receiving a radio call from a Michigan State Trooper identifying a white vehicle containing the suspected perpetrators of an armed robbery which took place only a few minutes earlier at a location 1 to 2 miles south of his then-present position. The call came at approximately 3:00 a.m., a time when traffic is at

a minimum. Deputy Webber then saw a white vehicle proceeding west on Webber Street; when he turned to follow, the car sped away.

I suggest that these circumstances, taken together, add up to considerably more than an ill-defined hunch and provide sufficiently reasonable suspicion to justify the Deputy's continued investigation. *See United States v. Long*, 464 F.3d 569, 574 (6th Cir. 2006) (finding reasonable suspicion where a "car roughly matching the appearance of [defendant's] in color and style was reportedly seen outside the [victim's] residence at the time the burglary occurred" was spotted in that vicinity and was speeding). Further, I suggest that neither the absence of more specific information about the car, such as its make and model, nor the difference in the number of persons in the car significantly undermines reasonable suspicion. *See Humphrey v. Mabry*, ___ F.3d ___, 2007 WL 957354 (6th Cir. April 2, 2007) (finding officers entitled to qualified immunity where they stopped a PT Cruiser that was bright blue although the suspect vehicle was described as a dark grey PT Cruiser where an officer in a helicopter told the officers the vehicle was "probably it" and where they believed the driver was armed); *United States v. Hurst*, 228 F.3d 751 (6th Cir. 2000) (reasonable suspicion present where officer stopped dark blue Mercury Cougar containing three persons that was not far from scene of burglary where victim had reported having seen dark-colored Thunderbird containing two persons); *cf., United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005) (reasonable suspicion absent where officer "knew only that a 'red vehicle' had been involved in a reported incident approximately 15 minutes earlier in the same general area where she first spotted the car").

Moreover, I suggest that the Court can presume from the Deputy's patrol experience that he knew that westbound Webber Street was readily accessible from northbound Dixie Highway (also known as East Genesee Street) via Hess Street and either Montgomery Street, Cumberland

10

Street, South 23rd Street or South 24th Street. (See attached map.) Thus, it would not be at all implausible to conclude that a vehicle westbound on Webber Street could have reached that position from the area of the reported armed robbery in Bridgeport. *See United States v. Babb*, 77 Fed. App'x 761 (6th Cir. 2003) (finding reasonable suspicion where, although bulletin described robbery suspect vehicle as a late model Oldsmobile Alero with two occupants, defendant's vehicle was a newer Oldsmobile Alero, defendant was the only occupant of the vehicle, and the vehicle was spotted 100 miles away two hours and forty-eight minutes after the time of the robbery); *United States v. Tilman*, 19 F.3d 1221 (7th Cir. 1994) (reasonable suspicion present where radio dispatch described and police stopped blue Mustang with light gray or silver stripe and Minnesota plates even though stop was made two hours after bank robbery and even though the vehicle was 50 miles west of the scene of the crime). I therefore suggest that the deputy had at least a reasonable suspicion sufficient to justify further investigative efforts.

The second prong of the *Terry* analysis examines whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place. *See Terry*, 392 U.S. at 20. An investigative detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed.2d 229 (1983). I suggest that the officers' actions were justifiable in light of Defendant's actions. At literally every turn, Defendant evaded or openly disregarded the deputy's instructions. As Deputy Webber turned around, the white vehicle sped away. When the vehicle finally stopped and Defendant exited, he refused to comply with Deputy Webber's instructions, first to stop, then to lie down. Instead, the Defendant sought and found refuge in the Carter Street residence. These actions, I suggest, only served to appropriately heighten and justify Deputy Webber's suspicion and concomitant actions.

As a result, I suggest that neither Deputy Webber's initial decision to undertake further investigation once he viewed what he believed to be the suspicious white vehicle, his subsequent investigatory actions, nor those of other officers which ultimately led to Defendant's apprehension and the discovery of the loaded weapon in his locked vehicle that he had been driving violated Defendant's Fourth Amendment protections.

Accordingly, I suggest that defense counsel's argument fails to carry the day and that the preponderance of evidence demonstrates that Defendant violated the mandatory condition of his supervised release.

## III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

s/ *Charles E. Binder*<br>
CHARLES E. BINDER<br>
United States Magistrate Judge

Dated: April 11, 2007

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on George Bush, Michael Hluchaniuk, and Kenneth Sasse, served on Steven Eimers by first class mail, and served on U.S. District Judge Cleland in the traditional manner.

Date: April 11, 2007          By    s/Patricia T. Morris
                                    Law Clerk to Magistrate Judge Binder



Attachment #1

